BRUSH ELECTRIC CO. *v.* ELECTRICAL ACCUMULATOR Co. *et al.*

*(Circuit Court, S. D. New York.   July 23, 1891.)*

1. PATENTS FOR INVENTIONS—ELECTRIC BATTERIES—INFRINGEMENT.
    The claim of letters patent No. 260,654, issued July 4, 1882, to Charles F. Brush, for improvement in forming the plates of secondary electric batteries, consisting in forming receptacles for oxide of lead in its surface, then applying oxide of lead to the plate and within such receptacles, and afterwards subjecting the oxide of lead to pressure, is not infringed by applying the oxide to the plates with a wooden trowel in the hands of the workman without afterwards subjecting it to pressure.

2. SAME—PATENTABILITY—INVENTION.
    Claims Nos. 11 and 13 of letters patent No. 337,299, issued March 2, 1886, to Charles F. Brush, for improvements in secondary electric batteries, are void for lack of invention, since such claims refer only to the use of red lead in the preparation of the plates, and the specification of the patent states that red lead is not as good for the purpose as peroxide of lead, but may be used instead of the peroxide, because it is cheaper.

3. SAME—ANTICIPATION.
    Letters patent No. 337,299, issued March 2, 1886, to Charles F. Brush for improvements in secondary electric batteries, are not invalidated by letters patent No. 260,653 and No. 276,155, issued to him prior to 1886 for other improvements subsidiary to the main invention described in said patent No. 337,299, for the reason that said patent, though issued after the others, was applied for before them, and is referred to in their specifications.   Delay in the patent-office, for which the inventor is in no way responsible, cannot be charged to him.

4. SAME—FORFEITURE—FOREIGN PATENT.
    Said patents No. 337,299 and No. 266,090 did not expire with the Italian patent issued to Mr. Brush, August 8, 1882, since the invention described in the Italian patent is not identical with those described in the United States patents.

In Equity.
*W. C. Witter* and *W. H. Kenyon*, for complainant.
*Frederic H. Betts*, for defendants.

COXE, J.   This is an equity action founded upon three letters patent, granted to Charles F. Brush for improvements in secondary batteries, as follows: No. 337,299, granted March 2, 1886, No. 260,654, granted July 4, 1882, and No. 266,090, granted October 17, 1882.   These patents and one other, No. 337,298, granted March 2, 1886, were before this court in *Brush Electric Co.* v. *Julien Electric Co.*, 41 Fed. Rep. 679.   The court there decided that No. 337,298 and No. 337,299 were for the same invention, and intimated, as the inventor and his expert apparently regarded the former as the broader patent, that the difficulty might be met by a surrender of the latter, or by a disclaimer of similar claims therein.   This solution of the difficulty was thrown out as a suggestion merely, the final disposition of the patents being left till the settlement of the decree. It was not the intention of the court to decide that one of these patents was entitled to preference over the other.   For the reason stated and for convenience of illustration No. 337,298 was given prominence in the discussion, but the conclusion would have been the same had the position of the patents been reversed.   Upon the settlement of the decree the complainant selected No. 337,299 as the patent upon which it chose to rely, and withdrew No. 337,298 from the consideration of the court. This was done without objection by the defendant in that case.   On the

15th of July, 1890, after the decree in the *Brush-Julien Case* was entered, the complainant withdrew No. 337,298 from this cause and an order was entered dismissing the bill as to that patent. The cause has since proceeded upon the three patents as stated. In the prior litigations involving the subject-matter of these patents the following propositions have been decided: *First.* That Mr. Brush was the first in this country to hold absorptive substance, in the form of dry powder, in place on the supports of a secondary battery by paper or equivalent material, and the first who rammed or pressed it into grooves or receptacles in the plates. *Second.* That No. 337,298 and No. 337,299 are for the same invention and that the complainant was not entitled to both patents, but was entitled to one. *Third.* The complainant having elected to hold No. 337,-299 it was decided, by the decree, that claims Nos. 1, 2, 3, 6, 7, 11, 12, and 13 were valid, the word "perforations" in claims Nos. 6 and 7 being construed as synonymous with "cells or cavities." *Fourth.* That the claim of No. 260,654 was not infringed by the application of the absorptive substance to the grids by a trowel or spatula. *Fifth.* That the defendants, by the use of supports filled with rows of uniform square holes, did not infringe the "rib claims" of No. 266,090. *Sixth.* That claims Nos. 7 and 14 of No. 266,090, the latter claim being limited to the "perforations" described, were valid and infringed. *Seventh.* That No. 337,298 (and by implication No. 337,299) was not invalidated by patents Nos. 261,512 and 261,995 granted to Mr. Brush, July 18, and August 1, 1882, respectively. *Eighth.* That No. 337,298 (and by implication No. 337,299) was not invalidated by the expiration of the Brush Italian patent. *Brush Electric Co. v. Julien Electric Co.,* 41 Fed. Rep. 679; *Electrical Accumulator Co. v. Julien Electric Co.,* 38 Fed. Rep. 126. All of these conclusions were reached after careful study and mature deliberation, and now, having been re-examined in the light of the present record, arguments and briefs, except as to claims Nos. 11 and 13 of No. 337,299, are reaffirmed. No useful purpose can be subserved by again discussing them, as such a task will only involve a repetition of what has been said already in the other cases.

The proof of infringement is substantially the same as in the *Brush-Julien Case.* It is more complete as to the manner in which the active material is applied to the plates, but in this respect it only emphasizes the former decision as to the non-infringement of the claim of No. 260,-654. That claim is as follows:

"The method of forming the plates of a secondary battery, consisting in forming receptacles for oxide of lead in its surface, then applying oxide of lead to the plate and within such receptacles, and afterwards subjecting the oxide of lead to pressure."

The claim clearly contemplates not only the treatment adopted by the defendants, but *afterwards* subjecting the oxide to pressure. The defendants apply the oxide to the plates and within the receptacles with a wooden trowel in the hands of the workman, and there they stop. They do not subject the oxide to pressure afterwards.

The questions arising upon the expiration of the Italian patent and as

to the validity of the "red lead claims" are, however, presented by this record in a new and different aspect and may, with entire propriety, be examined *de novo*, together with the question, not heretofore considered, relating to the effect of Brush patents Nos. 260,653 and 276,155 upon the broad patent in suit.

It is thought that claims Nos. 11 and 13 of No. 337,299—the red lead claims—are void for lack of invention. The specification, after referring to lead oxide as the active material, which is primarily and mechanically applied to the plates, proceeds:

"Peroxide is the best oxide of lead to use in the preparation of the plates; but as this is rather expensive to prepare red lead or minium may be used."

If the record contained nothing but this statement the claims could not be upheld. After the invention of a support primarily coated with mechanically applied oxide of lead, merely coating the plate with the commonest, cheapest and best known form of lead oxide did not require the exercise of the inventive faculties. Especially is this so when the patentee himself asserts that the best results can be obtained by using peroxide. It would seem that the use of red lead would at once occur to any one who had even a superficial knowledge of the art. There is no more novelty in using red lead for the coatings than there is in using cast lead for the plates. *Brush Electric Co.* v. *Julien Electric Co.*, *supra*, 692. The following paragraph taken from defendants' brief states with clearness and precision the views of the court upon this subject:

"The specification says that red lead is inferior to the peroxide, and we submit that no valid claim can be founded upon the use of an inferior article when it is shown that the use of the superior article is old."

Patent No. 337,299, at least so far as its broad claims are concerned, is not invalidated by anything contained in the Brush patents No. 260,-653 and No. 276,155. The application for the former (No. 260,653) was filed June 15, 1882, a year and two days after the application of No. 337,299. No one can read the specification of No. 260,653 without being impressed with the fact that the inventor intended to confine the patent to a single point, namely the form of the electrodes. He expressly says so.

"This application is a division of my application designated as 'Case 1' (337,298-9) filed June 13, 1881, in which other features of my invention are claimed. For convenience in distinguishing this invention among others of mine in the class of secondary batteries I have denominated it 'Case 1, Division A.' "

Again he says:

"My invention consists essentially in a secondary battery element consisting of a structure of *étagère*-like form, containing in the spaces between its shelves lead in a finely divided state."

The claim is:

"In a secondary battery, an element consisting of a structure of *étagère*-like form, containing in the spaces between its shelves lead in a finely divided state, substantially as set forth."

It is true that the broad invention is described, but it is equally true that it is not claimed. It was hardly possible for the patentee to describe the subsidiary invention without disclosing his main invention. Having disclosed it, had he permitted the patent to issue without warning or reservation, and after the broad invention became public property, had filed an application covering what he thus relinquished to others, it is probable that he would have been informed either in the patent-office or in the courts that his application came too late. But that is not this case. Before his application for the subordinate invention he had applied for the superior one. In the former he expressly informed the public that it was but a division of the latter. He could do no more. The delay in the patent-office cannot be charged to him. Even though the inventor were responsible for the issue of the divisional before the principal patent—and he was not—the fact of such prior issue in no way misled the public. They never for a moment acquired the right to use the broad invention. An infringer with the statements on the face of No. 260,653 before him would scarcely have the hardihood to assert that he supposed the broad invention was released. No court would listen to such a plea. The claims of that patent did not protect Mr. Brush in the use of the broad invention. A person who did not use an "*etagere-*shaped" plate could, if no other patent prevented, use the broad invention with perfect impunity. No. 337,299 was intended to prevent such use. The court has not been able to discover an authority holding a broad patent invalid in such circumstances. None has been cited by counsel. What is true of No. 260,653 is also true of No. 276,155.

Mr. Brush was the first, in this country, to make the broad invention as stated above. He is entitled to the fruits of his invention. It is the policy of the law to reward him. Where the court can see that a patentee has produced an invention of real merit it should not be unduly industrious in endeavoring to discover some statement or act of his by which, on technical grounds, his rights may be forfeited. It should rather be sedulous to protect him. Whether or not the improvements patented by Nos. 260,653 and 276,155 are the same as the improvements covered by some of the claims of Nos. 337,299 and 266,090 it is, perhaps, unnecessary to decide, for none of the claims in issue and infringed are so affected. It seems that in his anxiety to claim his invention in every conceivable form the patentee has involved himself in a labyrinth of descriptions and claims in which electrician and lawyer alike are quite apt to become confused. What Mr. Brush accomplished in 1879 and 1880 can be embraced in a brief, clear and concise statement. What he actually did is the test by which his patents must be judged. He is entitled to what he invented and only this. His patents can receive no broader construction because he describes his inventions with irksome prolixity and gives to the same structure a wearisome variety of names. The nomenclaturist should not seek the reward for his labors in the patent-office. A person is not entitled to a patent because he has invented a new word. The danger and impropriety of holding a number of claims which can be differentiated only by the most abstruse and metaphys-

ical distinctions, seem apparent. They are calculated to embarrass the inventor and mislead the public.

Did patents Nos. 337,299 and 266,090 expire with the Italian patent? The Italian patent was applied for July 28, 1882, sealed August 8, 1882, and was issued for a term of three years from September 30, 1882. It expired September 30, 1885, never having been prolonged, renewed or extended. No. 337,299 was granted March 2, 1886, No. 266,090, October 17, 1882; both were applied for in June, 1881. Having stipulated that the Italian patent was issued for an unextended term from September 30, 1882, and that the translation appearing in the record is a correct one, the complainant is not in a position to argue that the patent was either extended as to time or limited as to its terms. Especially is this so in the absence of the Italian patent law, which is not in evidence, and of all proof tending to establish either extension or limitation. The difficulty with the complainant's argument in this regard is twofold: *First*, there is no law, and, *second*, there are no facts upon which to base it.

Section 4887 of the Revised Statutes is as follows:

"No person shall be debarred from receiving a patent for his invention or discovery, nor shall any patent be declared invalid by reason of its having been first patented or caused to be patented in a foreign country, unless the same has been introduced into public use in the United States for more than two years prior to the application. But every patent granted for an invention which has been previously patented in a foreign country shall be so limited as to expire at the same time with the foreign patent, or, if there be more than one, at the same time with the one having the shortest term, and in no case shall it be in force more than seventeen years."

Under this section the test of identity between the foreign and the domestic patent as established by the supreme court in two recent decisions may be stated as follows: Is the principal invention in each, is the thing patented abroad, the same in all essential particulars as the thing patented here? Will the home patent be infringed by a structure made in accordance with the provisions of the foreign patent? In cases where these questions are answered in the affirmative the United States patent falls, and it will not be saved by the fact that it contains improvements not found in the foreign patent. *Siemens' Adm'r v. Sellers*, 123 U. S. 276, 8 Sup. Ct. Rep. 117; *Commercial Manuf'g Co. v. Fairbank Canning Co.*, 135 U. S. 176, 10 Sup. Ct. Rep. 718. Whether the expiration of a foreign patent for an improvement only will operate to overthrow a domestic patent for a broad invention, which contains also a claim covering the improvement, has not, apparently, been decided by the supreme court. The language of the court in *Siemens' Adm'r v. Sellers*, *supra*, is, perhaps, comprehensive enough to cover such a contingency, but this is a question which need not now be considered. In the *Brush-Julien Case* the court commented upon the absence of expert testimony relating to the Italian patent. No similar observation can, with propriety, be made regarding the present record. It would indicate a lamentable want of appreciation on the part of the court to ask for additional instruction and advice. Eight experts of greater or less prominence and attainments

have testified upon this subject.    Three of these, called by the defendants, have expressed the opinion that the divisions of the Italian patent describe everything claimed in the United States patents granted to Mr. Brush and that the inventions covered by the two patents, No. 337,299 and No. 266,090, are literally described and substantially claimed in the Italian patent.    On the other hand, five electricians, including the patentee himself, have testified that the Italian patent relates to inventions wholly different and proceeds upon totally dissimilar lines.    In short, that it is but a progressive step in the Planté method, its object being to aid the process of electrical disintegration of the plates in the electrolyte and not to supersede that process by placing the active material mechanically upon the plates prior to immersion in the battery fluid.    The mere fact that these gentlemen of conceded ability and learning, whose motive is to enlighten the court and who are all sworn to tell the truth, differ so radically regarding the meaning of the Italian patent is of itself suggestive.

The defendants plead the defense of forfeiture.    They must prove it by a preponderance of evidence.    And, yet, upon the question of the identity of the patents in question there is a sharp difference of opinion among those who are most entitled to speak upon the subject.    Is there not room for the assertion that the defendants have failed to sustain the burden in this behalf?    When this question was presented in the *Brush-Julien Case* the mind of the court was in doubt, and now, having re-read the Italian patent in the light of the new testimony, it is still in doubt, but inclining more strongly to the opinion that the complainant's contention is correct.    The court is not prepared to hold, therefore, that the Italian patent is for the same inventions as those covered by the two patents in question.    The principal reasons which induce the court to adopt this view may be epitomized as follows:

*First.*    The language of the Italian patent is entirely different from that of the patents in suit.    The drawings are different.    Some of the divisions of the Italian patent are unquestionably dissimilar and some concededly relate to the Planté process.    The broad statement relating to the primary coating of the supports with active material is not found in the Italian patent.

*Second.*    The inventor's statement of his intent and purpose in taking the foreign patent and his reasons for not attempting to patent the invention of No. 337,299 abroad.    This testimony is corroborated by his notes made at the time he was perfecting the inventions patented abroad. When these notes are placed side by side with corresponding portions of the Italian patent it will be seen that they are substantially similar. Mr. Brush testifies that the portion quoted describes the invention of Division D of the Italian patent.

| *Brush's notes, March* 7, 1882. | *Division D, Italian Patent.* |
|---|---|
| "About three weeks ago I conceived the idea of preparing secondary battery plates by compressing partially oxidized precipitated metallic lead, in | "In this division I shall treat a secondary battery element, wherein, before treatment by a 'forming' process, either the entire body thereof, |

the form of a fine powder, with great pressure, whereby I expect to get a solid metallic plate coherent and malleable. * * * Now, by using very finely granulated or precipitated lead, and slightly oxidizing superficially each particle, spontaneously by exposure to the air, or otherwise, and then compressing the metal, I will get a lead plate having minute seams throughout its substance filled with oxide of lead. This will very greatly facilitate the oxidation of the plate in the process of ' forming ' in the battery. It will probably be found advantageous to coat a sheet of ordinary roller lead on one or both sides with this peculiar fissured metal so that the rapid oxidation in the battery will be arrested by the rolled metal when the prepared metal is all oxidized."

or only the coating or covering of a suitable core or body, consists of a mass, composed of metallic lead and lead oxide, in an intimately mixed condition, pressed or united together into a compact and firmly coherent mass.

"In constructing this mass I take metallic lead in a pulverized, granulated, precipitated, or other finely-divided state, and allow the surface of the lead particles to become oxidized, either by exposure to the air, or by any suitable artificial oxidizing process or application. * * * I now subject the mixture to heavy pressure, hydraulic, or otherwise, whereby its particles are united and consolidated into a compact and firmly coherent mass. The mass thus formed consists of metallic lead, having minute veins of oxide of lead everywhere ramifying and extending through it; and these veins of lead oxide within and throughout the mass greatly facilitate the penetration of the electrical action in 'forming' the plates for operative use in secondary batteries."

The notes of March, 1882, seem to describe the invention of Division D; they certainly do not describe the invention of No. 337,299.

*Third.* United States patents, other than those in question, were issued to Mr. Brush for the divisions of the Italian patent evidently including Division D. At that time, therefore, neither the inventor nor the patent-office officials thought these inventions, or any of them, were the same as No. 337,299. Furthermore, the attention of the officials was particularly called to the foreign patents. The opinion of the United States officials seems to have been entertained also by those of Italy, France and England. Faure's invention was well known abroad and yet the patents issued to Brush with no objection, apparently, from any source that they interfered with Faure.

*Fourth.* The fact that a sharp distinction is drawn in No. 337,299 between the inventor's and Planté's method. Mr. Brush claims his secondary battery element "as contradistinguished from a plate or element having the active material produced by the disintegrating action of electricity as in the well-known Planté process." There is nothing of this in the Italian patent. On the other hand the inventor clearly intimates that the plates of Division D are to be formed by the Planté process.

*Fifth.* The vast superiority of the electrodes of the United States patents in question over those made in accordance with the directions of the Italian patent, as demonstrated by the experiments of the complainant's experts. A careful reading of Division D in the light of the testimony

has convinced the court that some, at least, of these experimental plates are made in conformity with the formula of that division. None of them are like the plates of No. 337,299.

*Sixth.* The Italian patent is capable of a narrow construction which differentiates it from the patents in suit. When to the statements of the patent itself is added the testimony of the inventor that he intended to limit the patent in all its branches to a coating formed by the action of the electric current and that he did not intend it to cover a coating placed on the plates mechanically before they are subjected to electrical action, there seems to be every reason why the narrower construction should be adopted.

*Seventh.* The fact that the element of the Italian patent is produced by heavy pressure, hydraulic or otherwise, whereby the particles of lead and lead oxide are compacted into a firmly coherent mass having minute veins of oxide of lead everywhere ramifying through it. There is nothing resembling this in the United States patents in suit.

*Eighth.* The "mass" described in the Italian patent is malleable and capable of being made into strips or wires and manipulated so as to form any style of element. Neither the active material of No. 337,299 nor the completed plate of that patent is capable of such treatment.

*Ninth.* No. 337,299 is designed to cover Mr. Brush's inventions made in the summer of 1879 and in the summer and autumn of 1880. *Brush Electric Co.* v. *Julien Electric Co., supra,* 687; *Electrical Accumulator Co.* v. *Julien Electric Co., supra,* 129–131. Bearing this in mind it is quite clear that the discoveries of these years alone are insufficient to support the Italian patent. Something more is required. What Mr. Brush did in 1879 and 1880 is not described in the Italian patent. What he did in 1882 is described there.

The foregoing are some of the reasons which have induced the court to overrule the defense of forfeiture; in fact the more the Italian patent is studied the more settled becomes the conviction that it is not for the same invention as No. 337,299. Apply the test suggested in *Commercial Manuf'g Co.* v. *Fairbank Canning Co.,* 135 U. S. 176, 194, 10 Sup. Ct. Rep. 718. If a person in this country, after the issue of No. 337,299, were to commence the manufacture of secondary batteries by the precise processes described in the Italian patent would the court grant an injunction to restrain their use as infringements of the claims of the United States patent? It is thought, upon the conflicting testimony here presented, an intelligent court would feel compelled to deny an injunction on the ground that infringement was not proved, or, at least, that the question was involved in such uncertainty and doubt as to justify the court in withholding the writ. It may as well be admitted that this defense does not appeal strongly to the conscience of a court of equity. The statute creates it and in all cases where the facts are clear the statute must be implicitly followed. But no one can examine the course of judicial decision upon the subject without being impressed with the fact that the courts have sought to construe it liberally and have seldom, except in the plainest cases, permitted it to defeat a valuable patent. Believing that Mr. Brush is entitled under our law to

protection for a meritorious invention the court should not, unless fully convinced that the facts warrant such a course, destroy his patents upon grounds which do not go to the merits of the invention, and which, for want of a more accurate word, may be termed "technical." Why a meritorious inventor, who is a citizen of this republic, should lose his rights at home because he has tried to protect them abroad is, on principle, not easy to comprehend. It is said the expiration of the Italian patent threw the invention into the public domain. So it did, into the domain of the Italian public, but if Mr. Brush had taken no patent in Italy the Italian public could have practiced the invention from the moment it became known there. Had he taken no foreign patents his invention would have been thrown into the public domain of every land but this. In this country his inventions would have been protected for 17 years, outside of this country they could have been used with perfect impunity. The inventor applied for his patent here long before he applied abroad, but through the delay of the patent-office the foreign patents were issued first.

Assuming the inventions to be similar, the inventor has been guilty of no fault, the American public has lost no rights, and yet, under the provisions of this statute, which it is thought was never intended to apply to a case like this, a valuable monopoly is destroyed. These observations are, perhaps, only germane to the present inquiry as they tend to emphasize the suggestion already made that in dealing with a defense where, as in this case, the disaster following the inventor's act is so out of proportion with the fault, if fault it be, the court should proceed with the utmost caution, and, where the evidence is not clear, give to the inventor the benefit of the doubt. If convinced that he did not intend to patent the invention abroad, the court should not by construction broaden the language of the foreign patent so as to destroy the domestic patent when that language is capable of a construction which permits the domestic patent to live.

The question of how to dispose of No. 337,298 is, in view of complainant's position regarding it, more puzzling than ever. The rule which obtains in this circuit requiring a disclaimer of invalid claims as a condition of a decree has always seemed an arbitrary one. It certainly seems inequitable that the court, at *nisi prius*, should compel the patentee to renounce forever a claim which may be held valid upon appeal. It is possible that this rule may be modified by the circuit court of appeals. In view of this contingency and of the extraordinary and distinguishing circumstances surrounding this case the court has concluded, if the complainant upon reflection still desires to assume the responsibility of retaining two patents for the same invention, not to require a surrender or disclaimer of No. 337,298 as a condition of a decree. It is thought, however, that pending an appeal it should be deposited with the clerk to await the further order of the court. An accounting having been waived, it follows that, on filing a disclaimer of claims 11 and 13 of patent No. 337,299 the complainant is entitled to a decree upon claims 1, 2, 3, 6, 7, and 12 of this patent, and upon claims 7 and 14 of No. 266,090 for an injunction, but without costs.