**LEWMAR MARINE, INC., Appellant,**

v.

**BARIENT, INC. and Barlow Marine, Ltd., Appellees.**

Nos. 86–1412, 86–1619.

United States Court of Appeals, Federal Circuit.

Aug. 25, 1987.

**27.** *See International Woodworkers of Am., Local 3–98 v. Donovan,* 792 F.2d 762, 767 (9th Cir. 1986).

Laurence S. Rogers, Fish & Neave, New York City, argued, for appellant. With him on the brief was Lars I. Kulleseid.

Karl A. Limbach, Limbach, Limbach & Sutton, San Francisco, Cal., argued, for appellees.

Before NIES, BISSELL and ARCHER, Circuit Judges.

NIES, Circuit Judge.

Lewmar Marine, Inc. appeals the July 14, 1986, judgment of the United States District Court for the District of Rhode Island, No. 83–0554 P (May 19, 1986), holding claims 1 and 2 of its United States Patent No. 3,927,580 and claim 11 of its United States Patent No. Re. 30,881 invalid as anticipated under 35 U.S.C. § 102 (1982). We reverse the judgment of invalidity. The judgment that Barient, Inc. and Barlow Marine, Ltd. infringed the claims, if valid, was not appealed and, thus, stands. Other defenses apparently remain to be tried.

I

Lewmar, a U.S. subsidiary of a British corporation, sells and services sailboat winches made by its British parent. It also owns two patents directed to sailboat winches. These winches are generally used on large sailboats to ease the burden of manipulating sails, and are of particular

importance on racing yachts such as those that compete for the America's Cup. On such a boat, a winch is operated by a sailor, called a "grinder," who turns the winch handle, or "crank," causing the winch drum to rotate and pull the rope, termed a "line" or "sheet," attached to the sail. The winch gives the grinder a mechanical advantage in pulling on the line, the load on which can fluctuate up to 12,000 pounds. At the start of hauling in, however, the sail is loose and little force is needed to pull in the line. At this point the line should be pulled in quickly, using the highest speed of the winch or "first," that is, the winch speed is selected to give the lowest mechanical advantage and, consequently, the highest speed. As the sail fills with wind and the line tightens, the force exerted to overcome the mounting wind pressure must increase. This increase in force is facilitated by shifting the winch into successively lower gears, that is, gears affording a greater mechanical advantage.

Another sailor, the "tailer," pulls on the end of the line coming off the winch in order to maintain tension on the line, thereby keeping it tightly wound around the winch drum. If the tailer pulls the line at a faster rate than the winch drum is being cranked, as is not uncommon when the line is slack, the winch drum will "overrun" by spinning faster than the grinder is cranking. In early winch designs, drum overrun caused the winch to inadvertently shift to a lower gear, or "override."

In the claimed inventions and in other winches, the gears are changed by reversing the direction in which the crank is turned. The '580 claims are directed to a winch with at least three speeds which can be selected by successive crank reversals, and which will not inadvertently shift upon drum overrun or otherwise.[1] The '881 claim is directed to a winch with at least three speeds which can shift in the same fashion as the '580 winch, but can also be operated as a two-speed winch.[2] The '881

1. The claims of the '580 patent that are alleged to be infringed are claims 1 and 2. Those claims read:

1. A winch in which there are more than two drive trains between a drive shaft and the winch drum offering respectively different drive ratios of drive of the drum in one sense of rotation, at least one of the driving trains having a disconnectable drive means, the ratios being successively engageable by successively opposite directions of rotation of the drive shaft, a preselector operable to determine which one of two of the said drive ratios engageable upon a given said direction of rotation of the drive shaft will be engaged, the preselector being thus operable by causing connection or disconnection of the disconnectable drive means in one of the said drive trains, and means automatically to disconnect the disconnectable drive means only upon reversal of the drive shaft from the given said direction of rotation.

2. A multispeed winch having a static body, a drum, bearing means supporting the drum on the body for rotation about an axis of rotation, a drive shaft, bearing means supporting the drive shaft in the body for rotation about the same axis of rotation, a plurality of drive linkages between the shaft and the drum operable to drive the drum in a single sense of rotation at different speeds upon successive rotation of the drive shaft at the same speed in successively opposite senses of rotation, one of the drive linkages including a manually engageable coupling means having engageable driving and driven members whose engagement constitutes engagement of the coupling, in which condition the driving member is arranged to drive the driven member unidirectionally in a driving sense of rotation upon relative rotation of the driving and driven members in one direction of rotation, the driving member, at least when the coupling means is engaged being operatively connected to the drive shaft for rotation when the drive shaft rotates in either sense, and means for automatically disengaging the coupling only when the drive shaft rotates in one sense of rotation relative to the static body of the winch, the drive linkage in at least the highest of the drive ratios including a unidirectional drive means oriented to prevent relative rotation of the driving and driven members in the sense opposite to the said one direction of rotation by the drum through that linkage.

2. Claim 11 of the '881 patent reads as follows:

11. A manually powered winch comprising: a winch drum rotatable about a central axis; drive input;

at least first, second and third drive trains of respectively different drive ratios between the drive input and winch drum;

means for causing successive driving engagement of said second drive train and disengagement of said first drive train upon a first reversal of direction of rotation of the drive input and driving engagement of said third drive train and disengagement of said second drive train upon a second reversal of direction of rotation of the drive input to drive the drum in one direction of rotation; and

means unaffected by a first reversal of the direction of rotation of the drive input engag-

patent discloses a three-speed winch with first and second speed hold, that is, the winch can be operated to shift between first and second and back by successive crank reversals. The need for the different types of operation, three-speed and two-speed, stems from the different types of sail handling necessitated by different types of sailing maneuvers. When sailing into the wind, the three-speed operation is used to take advantage of the full range of gears. When sailing with the wind, speed in sail handling is the focus, and the full range of gears is not needed.

Lewmar sued Barient, Inc., a California Corporation, and Barlow Marine, Ltd., Barient's Australian parent (collectively Barient), for infringing claims 1 and 2 of the '580 patent and claim 11 of the '881 patent. Barient defended *inter alia* on the ground that a four-speed winch it had made many years before, the "American Eagle" winch, anticipated each of the claims in issue. The American Eagle winch was designed in 1964 and is so named because it was used on a 12–meter yacht, the American Eagle, which participated in the trials for the 1964 defense of the America's Cup. The district court held that the American Eagle winch anticipated the inventions of all three claims at issue and thus held the claims invalid under 35 U.S.C. § 102(a).

## II

■ Anticipation under 35 U.S.C. § 102 requires the presence in a single prior art disclosure of each and every element of a claimed invention. *Verdegaal Bros., Inc. v. Union Oil Co.*, 814 F.2d 628, 631, 2 USPQ 2d 1051, 1053 (Fed.Cir.1987); *Carella v. Starlight Archery*, 804 F.2d 135, 138, 231 USPQ 644, 646 (Fed.Cir.), *modified on reh'd*, 1 USPQ 2d 1209 (Fed.Cir.1986); *Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 756 F.2d 1556, 1560, 225 USPQ 253, 256 (Fed.Cir.1985); *Lindemann Maschi-*

nenfabrik GMBH v. American Hoist & Derrick Co., 730 F.2d 1452, 1458, 221 USPQ 481, 485 (Fed.Cir.1984); *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548, 220 USPQ 193, 198 (Fed.Cir.1983). The district court acknowledged that basic principle, slip op. at 21–22, but went on to make the following observations:

> As the defendants put it, "[t]hat which infringes if later in time will anticipate if earlier than the patent.... The inquiry as to anticipation is symmetrical with the inquiry as to infringement of a patent." The classic test of anticipation provides: "That which will infringe, if later, will anticipate, if earlier. Thus a claim fails to meet the novelty requirement if it covers or reads on a product or process found in a single source in the prior art."

*Id.* at 22. While "the classic test of anticipation" was indeed as stated,[3] under the current statute "anticipation" does not carry the same meaning as before, and the "classic test" must be modified to: That which would *literally* infringe if later in time anticipates if earlier than the date of invention.

■ As noted in *Argus Chem. Corp. v. Fibre Glass-Evercoat Co.*, 759 F.2d 10, 14 n. 5, 225 USPQ 1100, 1102 n. 5 (Fed.Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985), prior to the Patent Act of 1952, the term "anticipation" was used in a broader sense than it is today. The pre–1952 cases often used the term "anticipation" to mean that the subject matter of the claims either was found exactly in the prior art (i.e., lacked novelty) or, though different, was not "inventive" over the prior art. *See In re Clark*, 522 F.2d 623, 635 n. 9, 187 USPQ 209, 219 n. 9 (CCPA 1975) (Miller, J., concurring). In the 1952 Act, Congress replaced the latter concept with 35 U.S.C. § 103, the requirement of nonobviousness. *See generally*

---

ing said causing means and operable to override and prevent the engagement of said third train by said causing means so that the first train is engaged upon said second reversal of direction of the drive input.

**3.** *See Miller v. Eagle Mfg. Co.*, 151 U.S. 186, 203, 14 S.Ct. 310, 317, 38 L.Ed. 121 (1894); *Knapp v.*

*Morss*, 150 U.S. 221, 228, 14 S.Ct. 81, 84, 37 L.Ed. 1059 (1893); *Commercial Mfg. Co. v. Fairbank Canning Co.*, 135 U.S. 176, 194, 10 S.Ct. 718, 724, 34 L.Ed. 88 (1890); *Peters v. Active Mfg. Co.*, 129 U.S. 530, 537, 9 S.Ct. 389, 392, 32 L.Ed. 738 (1889).

Rich, *Laying the Ghost of the "Invention" Requirement,* 1 APLA Q.J. 26 (1972), *reprinted in Nonobviousness—The Ultimate Condition of Patentability,* 1:501 (J. Witherspoon ed. 1980) (hereinafter *Nonobviousness*); Rich, *The Vague Concept of "Invention" as Replaced by Section 103 of the 1952 Patent Act,* 46 J.Pat.Off.Soc'y 855 (1964), *reprinted in Nonobviousness, supra* at 1:401; P. Federico, *Commentary on the New Patent Law,* 35 U.S.C.A. 1, 20–23 (1954). "Anticipation" thereafter became a restricted term of art in patent law meaning that the claimed invention lacked novelty, or was unpatentable under 35 U.S.C. § 102. *In re Clark,* 522 F.2d at 635 n. 9, 187 USPQ at 219 n. 9.[4] It is as a restrictive term of art that the word is used in this opinion. All infringements of a device do not "anticipate" in this sense. Some may be infringements under the doctrine of equivalents which, if one wished to draw a parallel, is somewhat akin to obviousness.

### III

■ The '580 patent specification discloses a winch mechanism which includes the drum and three gear trains in a single pedestal. The drum is turned unidirectionally by a manually operated crank. Since the invention requires at least three speeds and the crank operates in only two directions of rotation, the same direction of the crank must, therefore, be used for more than one speed. The prior art shows two-speed winches where the change in gears, e.g., from first to second and back to first, is accomplished upon reversal of the crank. It also shows three-speed winches which had a problem of shifting inadvertently because of drum override, and four-speed winches which change speed by operating a clutch at the time of moving from second to third. Lewmar asserts that its '580 patent was the first to combine, in a single winch, override protection and automatic shifting through three gears only upon crank reversal.

According to the specification, the grinder pre-selects first speed by pressing a button in the hub of the crank handle, which engages a clutch member with the first speed gear train. Upon crank reversal, the clutch member disengages from the first speed gear train because of the configuration of the mating clutch and gear teeth and the second speed gear train engages. On next reversal, the winch shifts to third (rather than first) because of the previous disengagement of the clutch member. Thus, after pre-setting in first, the '580 winch will progress automatically, that is, without further adjustments, through first, second, and third upon successive reversals of the crank. The invention of the '881 patent has the improvement of being able to lock out the third speed and thereby use first and second on successive crank reversals, i.e., 1–2–1–2. This improved winch was used on nine yachts in the 1983 America's Cup Race.

The American Eagle winch which the district court found anticipated each of the subject claims is a four-speed winch with planetary gears. The gears shift from first to second upon crank reversal. In the high range (1–2) the teeth on the face of the ring gear are engaged with corresponding teeth in the base of the pedestal acting as a clutch. By operation of a foot pedal, the clutch is disengaged, the planetary gear system drops away from the pedestal base, and the ring gear is free to rotate. Operation of the gear system in this position by crank rotation affords the low range, speeds 3 and 4. Speeds 1 and 3 are thus obtained in one direction of rotation of the crank handle and speeds 2 and 4 in the other.

The court described the operation as follows:

As I have already explained, the three speed automatic shifting of the American Eagle winch involves speeds 2, 3 and 4. With the winch being operated in speed 2, the foot pedal is pressed to the low speed range and the winch will continue

---

**4.** It is not surprising that the older usage of "anticipation" dies hard and has continued to appear in cases after 1952, e.g., *Tate Engineering, Inc. v. United States,* 193 Ct.Cl. 1088, 477 F.2d 1336, 1342, 175 USPQ 115, 119 (1973).

in speed 2 as long as there is tension on the crank handles. The torsion spring exerts a counterbalancing force on the planetary gears to prevent them from dropping down and causing engagement of the low speed range gear train. *When the tension on the winch handles is removed or the direction of cranking is reversed,*[5] the selector/compression spring (compressed during pedal depression to low speed range) exerts sufficient force on the selector level/carrier shifter to cause the planetary gears to drop down into the low speed range position; the winch on this reversal goes into speed 3 and a further reversal causes the winch drum to turn as speed 4, thus completing the automatic three speed shifting cycle from second to third to fourth.

Without the torsion spring, the winch would not be able to shift automatically through a three speed range. Instead the shifting would be automatic only through speeds 3 and 4 since the instant the foot pedal was depressed to select the low range, the planetary gears would drop by their own weight to cause engagement of the low speed (³⁄₄) range. Therefore, the properly adjusted torsion spring is a necessary component to allow automatic shifting over a three speed range.

Slip op. at 23–24 (emphasis added).

A major dispute between the parties is whether the American Eagle winch actually had the torsion spring which was necessary to prevent immediate shifting (changing from the high 1–2 range to the lower 3–4 range) upon depressing the foot pedal. The district court found from the testimony that the torsion spring was not a later addition, and we will accept that as a fact for purposes of our analysis.

The question we address is whether the above-described mechanism meets the limitation "means automatically to disconnect the disconnectable drive means only upon reversal of the drive shaft from the given said direction of rotation" of claim 1 and comparable language of claim 2. We conclude it does not.

The claim limitation could possibly read on the American Eagle winch if the word "only" did not appear in that clause. The word "only," however, is there and may not be read out of the claim. Indeed, in determining validity, a claim must be construed to uphold its validity if possible. *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577, 221 USPQ 929, 932 (Fed.Cir.1984). Here, the district court construed the word "only" unnecessarily in a manner which led to a finding of anticipation.

The district court interpreted the term "only" in claims 1 and 2 of the '580 patent as follows:

The word "only" is used in an operational sense, i.e., where the winch is being operated (with tension on the han-

---

5. Barient does not dispute that the American Eagle winch shifted from high 1–2 range to low 3–4 range on release of pressure on the crank handle. Barient explains an incongruous statement in footnote three of the district court's opinion, that disconnection on release of tension was due to an improperly adjusted spring, as referring not to the American Eagle but to another winch. There is simply no evidence that the American Eagle winch did not change from high to low range upon release of pressing on the crank handle thereby causing it to shift out of second. The only evidence on this point is the testimony of Guangorena, that the spring was properly adjusted, and the testimony of Huggett, that the spring could not be adjusted. Further, Barient's witness Mr. James Michael testified that, operating under wind conditions, the grinders needed to maintain pressure on the crank handle of the American Eagle winches in order to avoid inadvertent shifting from second speed to fourth speed. Lewmar's witness Mr. William McKay, Jr., who had inspected another Mark II winch aboard the yacht Barlovento, confirmed Michael's testimony. Guangorena's testimony is also in accord with the finding set out in the body of the opinion. Since the statement in the footnote is inexplicable, it need concern us no further.

dles) the disconnectable drive means will automatically disconnect *only* on crank reversal.

Slip op. at 33 n. 3. The court's interpretation of the word "only" to mean when the winch was being operated under a load is contrary to the inventor's description of his invention and to the invention's purpose stated in the specification. The court did not refer to the specification in its opinion and apparently did not consider it. This was error.

The specification of the '580 patent states that one of the problems which the claimed invention sought to overcome was that "one of the gears [in prior art devices] can slip out of engagement whenever pressure is taken off the crank handle." The claims, as interpreted by the specification, do not use "only" in an operational sense, but in an absolute sense. That the claims use "only" in an absolute sense is bolstered by the prosecution history. The inventor's attorney argued to the patent examiner that one of the "two essential legs of the present invention" is the "means preventing spurious automatic operation." Barient points out that, during prosecution, Lewmar distinguished certain prior art as inadvertently shifting upon drum overrun. From that argument, Barient asserts that the scope of the claimed invention is limited to preventing spurious automatic shifting *as a result of drum overrun.* We disagree. Nothing in the specification or prosecution history limits the claimed invention to preventing inadvertent shifts due to drum overrun. The district court's interpretation of the term "only" as limited in an operational sense, i.e., "only" except for pressure on the crank handle, is contrary to the specification and the prosecution history, and thus is wrong as a matter of law.

When claims 1 and 2 are properly interpreted, the American Eagle winch does not anticipate because shifting does not occur *only* upon crank reversal. That winch does shift from second to third only upon reversal. However, it will also shift from second to fourth if pressure is released from the crank and the crank is then turned in the same direction of rotation.

Thus, shifting does not occur *only* upon the grinder's *reversing* the direction of his cranking.

Barient argues that release of pressure on the crank handle necessarily results in a slight reversal of the drive shaft and that, therefore, shifting literally occurs "only upon reversal of the drive shaft" (claim 1) and "only when the drive shaft rotates in one sense of direction" (claim 2). Thus, per Barient, those winches meet the limitations literally, even if the term "only" is interpreted in an absolute sense. Barient points to testimony of Jesus Guangorena, the designer of Barient's winches, and Marshall Dann, Lewmar's expert witness, to the effect that the gears of the American Eagle winch will not disengage without a slight reversal of the drive shaft. That is so, Barient asserts, because the winch is held in second gear by frictional resistance, particularly between the teeth on the face of the ring gear and those in the pedestal, which must be eliminated before the gears can shift. Guangorena described the required crank shaft rotation as "a very small angle of arc" and stated that it occurred "automatically" by "easing off pressure." Dann described such motion as "very trivial." Accepting Barient's assertion as fact *arguendo* (the district court made no findings in this regard), we reject Barient's argument. Returning to the specification's statement that one of the problems with the prior art winches was that "the gear change . . . is so simple that one of the gears can slip out of engagement whenever pressure is taken off the crank handle," the specification makes clear that the very small angle of crank rotation which occurs upon release of pressure from the crank handle does not fall within the claim limitations. The claims clearly contemplate an affirmative act by the grinder to reverse the direction of the crank handle.

In sum, the American Eagle winches were erroneously held to anticipate the invention of claims 1 and 2 of the '580 patent.

## IV

Turning to Claim 11 of the '881 patent, the district court held that the claim reads

literally on the American Eagle winch. The '881 patent discloses a three-speed winch capable of operation either through the full three-speed range or through just the first two speeds. The American Eagle winch is a four-speed winch. The district court explained how the claims, written to encompass more than just the three-speed winch disclosed, could be read on the four-speed winch:

There are three different drive trains capable of being automatically shifted on the American Eagle winch. They are second, third and fourth. (The winch includes a still higher speed drive train—first—which is not included in the automatic shift sequence.) Therefore, the comparison must be between first, second and third speeds of the 881 winch and second, third and fourth speeds of the American Eagle winch. While it is claimed by plaintiff that the terminology "first, second and third" refers to the three highest speeds, there is no support in the patent for this assertion. Since the 881 winch has only three speeds, the claim can be read on any consecutive set of three speeds of a winch which itself is capable of more than three speeds. In the American Eagle winch this would be the three speeds: second, third and fourth.

Slip op. at 33 n. 4. Lewmar contends that the district court erred in interpreting the claim's first, second and third speeds to cover the second, third and fourth speeds of the American Eagle winch. Rather, Lewmar contends, the claim should be limited to cover only the first, second and third speeds of the American Eagle winch. Lewmar relies on the testimony of the inventor Huggett to that effect. According to Huggett, it is clear from the disclosure that "first speed is the speed of least mechanical advantage." Indeed, the specification refers to the first speed as "the ratio of lowest mechanical advantage to the user," and "that of highest drive transmission between the drive input shaft and the drum and therefore of lowest mechanical advantage." But the specification also describes the third speed as "that of greatest mechanical advantage." Thus, apply-

ing Lewmar's analysis, the claim's third speed could only cover the fourth speed of the American Eagle winch. The specification provides no basis for Lewmar's argument. Nor are we persuaded that Huggett's testimony is sufficiently specific with respect to the meanings which should be given these words of the claims.

■ It is undisputed that the claim covers winches with greater than three speeds. Lewmar contends that the hold feature is used to restrict the winch to operation in the two highest speeds, the two fastest. The claim does not, however, explicitly limit its coverage to winches with a hold feature for the two highest speeds. Nor does the specification hint that the invention is limited to a winch with a hold feature for the two highest speeds. Lewmar does not even argue that the prosecution history contains such a limitation. In short, we agree with the district court that there is no basis in the record for the limitation urged by Lewmar.

■ That is not to say that the American Eagle winch anticipates claim 11. The last element of claim 11 requires:

means unaffected by a first reversal of the direction of rotation of the drive input engaging said causing means and operable to override and prevent the engagement of said third train by said causing means *so that said first train is engaged upon said second reversal of direction of the drive input.* [Emphasis added.]

The district court defined "first train" to mean second speed of the American Eagle winch, "second train" to mean third speed of the American Eagle winch, and "third train" to mean fourth speed. Thus, the last element of the claim requires that the second reversal of direction of the drive input, at which time the winch is in third speed, cause the American Eagle winch to shift to second speed. In other words, the hold feature of the claims requires that the American Eagle winch, to anticipate, automatically shift between second and third speeds. It is undisputed that it does not. Notwithstanding that the last limitation of claim 11 does not literally read on operation

of the American Eagle winch, the district court held that the American Eagle winch's automatic operation between first and second speeds satisfied that limitation. That holding is wrong as a matter of law.[6]

## Conclusion

We reverse the judgment of the district court insofar as it declares that claims 1 and 2 of U.S. Patent No. 3,927,580 and claim 11 of U.S. Patent No. Re. 30,881 are invalid for anticipation, and the case is remanded to the district court for further proceedings consistent herewith.

REVERSED–IN–PART AND REMANDED.

---

**6.** We find no merit in Barient's derivation argument, which we note was not addressed by the district court.