**SCHAWBEL CORPORATION,**
**Plaintiff,**

v.

**CONAIR CORPORATION, Defendant.**

**No. Civ.A. 00–11112–PBS.**

United States District Court,
D. Massachusetts.

Nov. 13, 2000.

Brenda M. Cotter, Brian Michaelis, Brown, Rudnick, Freed & Gesmer, P.C., Boston, MA, for Schawbel Corporation, Inc., plaintiff.

H. Bissell Carey, III, Robinson & Cole, Boston, MA, for Conair Corporation, defendant.

Douglas C. Allen, JAMS, Boston, MA, ADR Provider, pro se.

A. David Mazzone, United States District Court, Boston, MA, ADR Provider, pro se.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *INTRODUCTION*

Plaintiff Schawbel Corporation alleges that Defendant Conair Corporation has infringed twelve claims involving four of Schawbel's patents relating to butane-powered curling irons.[1] Schawbel moves for a preliminary injunction, arguing that Conair's continued infringement will likely force Schawbel to go out of business. Although not waiving its other claims, Schawbel relies on Claim 7 of the '123 patent as its best case for infringement for purposes of preliminary relief. Conair disputes infringement and also contends that Schawbel's patents are anticipated by a prior soldering iron patent and invalid by virtue of Schawbel's failure to disclose this prior art to the patent examiner during prosecution.

---

1. The four specific patents at issue are U.S.Patent Nos. 4,699,123; 4,759,343; 4,733,651; and 4,815,441 (collectively the "Schawbel Patents"). The accused Conair product is Model No. CC267CS.

After hearing, Plaintiff's motion for a preliminary injunction is **ALLOWED.**

## II. FACTS

### A. Background

Schawbel is a small company that manufactures and sells personal care appliances. It has nine employees in the United States and seven employees worldwide. Its most popular products are butane-powered curling irons and replacement cartridges, which account for eighty to ninety percent of Schawbel's revenues over the last several years. These personal care appliances are known as the Thermocell ® line. The Schawbel Patents are all derived from the '651 patent, which it obtained on March 29, 1988.[2]

On September 11, 1996, Schawbel entered into an exclusive licensing agreement with Conair, under which Conair would distribute Schawbel's butane-powered curling irons under Conair's brand name. One of the provisions in the agreement stated: "During the term of this agreement and for five (5) years thereafter, Conair shall not develop, own or apply for any patents on products, or manufacture such products, which would infringe Schawbel's patent rights." Agreement ¶ 7. After a series of disputes which the parties were unable to iron out, the agreement terminated in September 1998, at which time Schawbel entered into a similar exclusive licensing agreement with Helen of Troy Limited. In May 2000, Conair began manufacturing and selling its own butane-powered curling iron, Model CC267CS, which Schawbel contends infringes on its patents.

Schawbel claims that Conair's curling iron has already caused Schawbel great damage in the form of lost sales. The holiday season is the hot selling season for curling irons, and retailers typically order their inventory many months in advance.[3] Schawbel believes that its current distributor, Helen of Troy Limited, has been unsuccessful in marketing and selling Schawbel's products, because retailers are reordering product based on the Store Keeping Units ("SKUs") that they assigned to Conair while Conair marketed Schawbel's product. Schawbel acknowledges that it has already missed most of this year's holiday ordering season and claims that it is in grave danger of being totally excluded from the holiday shelves. If it is excluded, Schawbel states that it may be forced out of business. Indeed, William Schawbel, the president and chief executive officer, claims that he had to offer his home as equity to secure a credit line to forestall Schawbel's bankruptcy. Schawbel argues (and Conair vigorously disputes) that it will be able to salvage the holiday season if the Court grants the requested relief, as retailers would turn to Schawbel's product should Conair be prohibited from filling the previously placed orders.

### B. Claim 7 of the '123 Patent

Schawbel relies on Claim 7 of the '123 patent to support its claim of Conair's infringement. Claim 7 was issued as follows:

A portable heating appliance having a *member to be heated*, comprising:

burner means for heating said member;

fuel supply means for supplying fuel to said burner means, said fuel supply means including stationary fuel delivery valve means for controlling the flow of fuel from said fuel supply means; and

actuator means for actuating said fuel delivery valve means in response to user actuation to start the flow of fuel

---

2. The '343 and '441 patents are continuations of the '651 patent, and the '123 patent is a continuation-in-part of the '651 patent.

3. The parties disagree as to the time retailers generally place their holiday orders. Schawbel contends orders are placed in the late spring and early summer, while Conair claims that they are placed in the first quarter of the calendar year. In any event, most of this season's holiday orders have been placed.

from said fuel supply means, said actuator means including a plunger, means for moving said plunger to a first position into operative engagement with said fuel delivery valve means for opening said fuel delivery valve means and means for moving said plunger to a second position out of operative engagement with said fuel delivery valve means so that the latter terminates the flow of fuel to said burner means;

said means for moving said plunger to said first position includes biasing means for applying a force to said plunger, wherein said biasing means constantly applies said force to said plunger to bias the latter into engagement with said fuel delivery valve means to control the latter to permit the flow of fuel from said fuel supply means.

## C. *The Accused Product*

Conair began manufacturing the accused product in May 2000. Its outward appearance is virtually identical in color and configuration to the commercial embodiment of Schawbel's patents.[4] Conair contends that its product is different because it does not have: 1) a stationary fuel delivery valve within its fuel supply means; 2) a stationary fuel delivery valve; 3) an actuator containing a plunger; 4) a plunger that engages a fuel delivery valve; or 5) a plunger with a biasing means.

## III. *DISCUSSION*

### A. *Preliminary Injunction Standard*

■ The Court has the authority to grant preliminary injunctive relief in patent cases "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. However, this relief is a "drastic and extraordinary remedy that is not to be

routinely granted." *Intel Corp. v. ULSI System Tech., Inc.,* 995 F.2d 1566, 1568 (Fed.Cir.1993).

■ To obtain a preliminary injunction, the movant must show each of the following four factors: 1) a reasonable likelihood of success on the merits; 2) irreparable harm in the absence of a preliminary injunction; 3) the balance of hardships weighs in favor of the plaintiff; and 4) the public interest favors an injunction. *Id.; Nutrition 21 v. United States,* 930 F.2d 867, 869 (Fed.Cir.1991). To obtain a preliminary injunction, a patent holder must show that there exists a reasonable likelihood of success on the merits with regard to the infringement of its patent by the defendant and the validity of its patent. *Hybritech Inc. v. Abbott Lab.,* 849 F.2d 1446, 1451 (Fed.Cir.1988).

While none of these factors alone is dispositive, preliminary injunctive relief may be precluded where the plaintiff fails to make a sufficient showing with respect to any one factor, as it is weighed and measured "against the other factors and against the form and magnitude of the relief requested." *Id.; Intel,* 995 F.2d at 1570.

### B. *Likelihood Of Success*

#### 1. *Infringement*

"Determining whether a patent has been infringed involves two steps: (1) claim construction to determine the scope of the claims, followed by (2) determination whether the properly construed claim encompasses the accused structure." *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353 (Fed.Cir.1998). An accused device may infringe a given patent claim, and thus the patent, in one of two ways: literally, or under the doctrine of equivalents. *Jurgens v. McKasy,* 927 F.2d 1552, 1560 (Fed. Cir.1991). "Literal infringement requires that the accused device contain each limitation of the claim [at issue] exactly; any

---

**4.** Schawbel asserts a design patent infringement claim in a related case. Conair claims

it designed the trade dress. That dispute will not be resolved here.

deviation from the claim precludes a finding of literal infringement." *Litton Sys., Inc. v. Honeywell, Inc.,* 140 F.3d 1449, 1454 (Fed.Cir.1998).

To construe a patent claim, courts principally consult evidence intrinsic to the patent, including the claims themselves, the specification, and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582-83 (Fed. Cir.1996). Of these elements, the claim's words carry the most weight. *Vivid Techs. Inc. v. American Science & Eng'g,* 997 F.Supp. 93, 97 (D.Mass.1997). These words should be given their ordinary and customary meaning unless the patentee clearly states a special definition in the patent specification or prosecution history. *Vitronics,* 90 F.3d at 1582.

"Whether the language of a claim is to be interpreted pursuant to 35 U.S.C. § 112, ¶ 6, i.e., whether a claim limitation is in means-plus-function format, is a matter of claim construction...." *Kemco Sales, Inc. v. Control Papers Co., Inc.,* 208 F.3d 1352, 1360 (Fed.Cir.2000). Section 112, ¶ 6 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. Here, the parties agree that a means-plus-function claim is at issue.

In construing that limitation, the Court must determine "what the claimed function is and what structures disclosed in the written description correspond to the 'means' for performing that function." *Kemco,* 208 F.3d at 1360. "[I]f one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by the claim language." *Atmel Corp. v. Information Storage Devices, Inc.,*

198 F.3d 1374, 1378-1379 (Fed.Cir.1999) (citing *In Re Donaldson Co., Inc.,* 16 F.3d 1189, 1195 (Fed.Cir.1994)). The means-plus-function provision "represents a *quid pro quo* by permitting inventors to use a generic means expression for a claim limitation provided that the specification indicates what structure(s) constitute(s) the means." *Id.* at 1381. The Court must determine the disclosed structure corresponding to the means limitation by looking at the written description in the specification, the preferred embodiments, and the accompanying drawings. *Kemco,* 208 F.3d at 1361-62.

In addition, patent claims, such as those found in Schawbel's '123 patent, that are written in means-plus-function language are also deemed to cover equivalent structures. 35 U.S.C. § 112, ¶ 6. An equivalent structure is one that performs "the identical function, in substantially the same way, with substantially the same result." *Kemco,* 208 F.3d at 1364. Such structures are deemed literally to infringe the patent. *Id.* As *Kemco* clarifies,

> In order for an accused structure to literally meet a section 112, paragraph 6 means-plus-function limitation, the accused structure must either be the same as the disclosed structure or be a section 112, paragraph 6 "equivalent," i.e., (1) perform the identical function and (2) be otherwise insubstantially different with respect to structure.

*Id.*

If an accused structure is not a § 112, ¶ 6 equivalent, it may nevertheless still be an "equivalent" under the doctrine of equivalents which applies the traditional function-way-result test to determine infringement. The doctrine of equivalents requires application of an equivalence analysis to the individual elements of a claim, and not to the invention as a whole. *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). It requires that "the accused structure ... perform sub-

stantially the same function, in substantially the same way, to achieve substantially the same result, as the disclosed structure." *Kemco*, 208 F.3d at 1364. The key distinguishing feature between the traditional equivalence analysis and the means-plus-function equivalence analysis is that § 112, ¶ 6 equivalents must perform the *identical* function of the disclosed structure, whereas traditional equivalence analysis requires the equivalent structure to perform *substantially the same* function. *Id.*

### a. *The Fuel Supply Means*

■ Claim 7 of the '123 patent requires a "fuel supply means including stationary fuel delivery valve means for controlling the flow of fuel from said fuel supply means." '123, col. 12, lines 38–40. Conair argues that two limitations in this language are absent in Conair's device: (1) the fuel delivery valve means must be stationary; and (2) the fuel delivery valve means must be located within the fuel supply means. Neither argument prevails.

With respect to the first point, Conair argues that the stem on top of the fuel supply cartridge in the Conair device is not stationary, because it slides in and out as the canister is moved. Schawbel has submitted the Declaration of Peter L. Berger, Esq., a patent attorney, which states,

> The Conair fuel delivery valve is identical to the fuel delivery valve of the Schawbel cartridge and the Schawbel patents. The only difference between the Conair structure and the claimed Schawbel structure is that the Conair structure moved the upper portion of the fuel delivery valve off of the cartridge and into the device itself in the form of the white structure immediately next to the cartridge in Exhibit A, Figure 7.

(Berger Aff. ¶ 16.) Berger argues that "[t]his minor modification is not of any consequence to the infringement analysis." *Id.*

In rebuttal, Conair has submitted the affidavit of Charles N.J. Ruggiero, Esq., a patent attorney, and the affidavit of Daniel Santhouse, Conair's Manager of Engineering who designed the accused device. These affidavits are largely unhelpful and confusing, because the parts of the accused Conair curling iron are not fully labeled in the accompanying diagrams (Santhouse Aff., Ex. 1.) Moreover, Conair did not produce pictures comparing the accused device with Schawbel's Thermacell ® curling iron. Because of these deficiencies, I found it difficult to be certain that I was comparing apples with apples. In contrast, I find that Schawbel's labeling of Conair's own construction of the accused device and of pictures of the two devices at issue was helpful. Therefore, in assessing likelihood of success, I drew inferences in favor of Schawbel where Conair did not clearly explain its position on the comparability of various parts.

With respect to the fuel delivery valve means, Conair's submissions were particularly confusing. Ruggiero describes, "The canister valve is a male valve that has a plunger, a non-movable canister seal and a canister spring." (Ruggiero Aff. 10.) Later, he states, "In the Conair device, the fuel delivery valve means is not stationary. Rather, it moves in an[d] out, as the canister is moved." (*Id.* at ¶ 23.) Ruggiero describes yet another valve as follows: "The first or actuator valve of the device has a valve member with an expanded head, a non-movable first valve seal, a first valve spring, a female fitting and a chamber." (*Id.* at ¶ 11.) Describing Conair's device as a "dual valve system," Santhouse states, "Conair's device has an extra valve, i.e., a regulator valve, which is located outside the canister or fuel supply means." (Santhouse Aff. ¶ 10.) There is no diagram or picture showing the "first or actuator valve," the "regulator valve" or the "dual valve" to which Ruggiero and Santhouse attest. Now, Conair seems to concede that the fuel delivery valve means is the valve located within the interior of the accused device (*See* Second Supplemental

Aff. of Frank Lindsey ¶ 13 ("Conair chose to not include its fuel delivery means within the fuel cartridge.")) Based on Schawbel's submissions and pictures, I find that Schawbel has shown a likelihood of success in proving that the Conair device has a fuel delivery valve means which is stationary in the interior of the body of the device (but not in the fuel cartridge).

Even so, Conair argues that its fuel delivery valve means is not "includ[ed]" in the fuel supply means, as expressly required by Claim 7, because no part of Conair's fuel delivery valve means (the exposed stem, the valve housing, or the cap) is inside the cartridge itself. Conair points to Figure 2 of the '123 patent specification which illustrates the fuel cartridge and shows that the fuel delivery valve means is inside the cartridge. Also, the patent's "Detailed Description of the Preferred Embodiments" states: "[C]artridge 18 includes a fuel delivery valve 30 at the end opposite fill valve 24. Specifically, fuel delivery valve 30 is assembled *in* molded well 32 *in* the end of the cartridge 18 ...." '123, col. 3, lines 37–40 (emphasis added). Both the written description and the accompanying drawings in the patent indicate that the disclosed structure corresponding to the fuel delivery valve means is *interior to the fuel canister.*

Schawbel urges the Court to avoid reading limitations into a claim from the specification and the preferred embodiments. *Laitram Corp. v. NEC Corp. and NEC Info. Sys., Inc.,* 163 F.3d 1342, 1347 (Fed. Cir.1998) (holding that limitations appearing in the specification will not be read into claims); *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1054 (Fed.Cir.1994) ("[A]lthough the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim

language is broader than such embodiments."). Schawbel argues that the claim itself is broadly written and does not require the fuel delivery valve means to be inside, enclosed within, or physically attached to, the fuel canister, but rather that it simply be included[5] as one sub-element in the fuel supply means. Nonetheless, the Court must look to the written description for the structure corresponding to the means limitation, *Kemco,* 208 F.3d at 1362, and the relevant structure is a fuel delivery valve means inside the fuel canister.

This does not end the inquiry, however, because Schawbel argues that the Conair device has an equivalent structure. A finding of an equivalent structure under § 112 requires the accused structure to perform the *identical function* as the disclosed structure, in addition to performing it in substantially the same way, with substantially the same result. *Id.* at 1364.

Schawbel argues that Conair's dual-valve system is an equivalent structure. I agree. Conair's fuel cartridge has a protruding male fitting. When the cartridge is inserted into the body of the accused device, the male fitting mates with a female valve that is stationary in relation to the device's plunger. Together, these valves perform the *identical* function as the disclosed structure—controlling the flow of fuel from the cartridge to the burner means. They perform this function in the same way—when the cap on the fuel delivery valve is engaged, fuel is allowed to pass onto the burner means. Finally, they accomplish the same result—supplying fuel to the burner means. Although the male fitting is an additional element in the accused device, it does not take the infringing structure out of the scope of the claims. *See Hewlett–Packard Co. v. Repeat–O–Type Stencil Mfg. Corp., Inc.,* 123 F.3d 1445, 1451 (Fed.Cir.1997) (holding

---

5. The word "include" is defined to mean "1. to contain, as a whole does parts or any part or element: *The package includes the computer, program, disks, and a manual.* 2. to place in an aggregate, class, category, or the like. 3. to contain as a subordinate element; involve as a factor." *Random House Unabridged Dictionary* 967 (2d ed.1993). It is not defined to mean physically enclosed.

that "[t]he claim term 'including' is synonymous with 'comprising' thereby permitting the inclusion of unnamed components").

■ Conair counters that prosecution history estoppel prohibits Schawbel from claiming that fuel valves that are external to the fuel canister fall within the range of equivalents.[6] Prosecution history is relevant to claim construction under § 112. *Cybor Corp. v. FAS Techs. Inc.,* 138 F.3d 1448, 1457 (Fed.Cir.1998). "The relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *Id.* The history Conair points to relates to the parent of the Schawbel Patents, the '651 patent. "When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patient that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 980 (Fed.Cir.1999); *see also Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.,* 66 F.3d 285, 291 (Fed.Cir. 1995) (stating that the relevant prosecution history for the patent at issue included the parent and grandparent patents).

According to Conair, Schawbel limited the range of equivalents it could claim through its Second Preliminary Amendment to the '651 patent application. The amendment distinguished the invention from prior art by stating,

> U.S.Patent No. 786,987 discloses a curling iron in which a cylinder e serving as a reservoir for fuel f (consisting of solidified methylated spirit) is screwed onto holder d. However, there is *no disclosure or suggestion of using any fuel supply cartridge having fuel delivery valve means,* or of any actuator means, as claimed herein.

Second Preliminary Amendment to U.S.Patent No. 4,733,651, Sept. 27, 1985, at 3–4 (emphasis added). Conair argues that this prosecution history estops Schawbel from asserting that the means-plus-function "fuel supply means" can be interpreted to include parts of the curling iron exterior to the cartridge.

■ Statements in a prosecution history must be read in the context of the attempt to distinguish the invention. *See Mark I Mktg. Corp.,* 66 F.3d at 291 (Fed. Cir.1995) (" 'The prosecution history must be examined as a whole in determining whether estoppel applies.' ") (quoting *Wang Lab., Inc. v. Toshiba Corp.,* 993 F.2d 858, 867 (Fed.Cir.1993)); *Read Corp. v. Portec,* 970 F.2d 816, 824 (Fed.Cir.1992), abrogated on other grounds by *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 975 (Fed.Cir.1995) (en banc) ("Every statement made by a patentee during prosecution to distinguish a prior art reference does not create a separate estoppel. Arguments must be viewed in context.").

■ Here, Schawbel argues that the prior art did not disclose a fuel delivery valve, because it used a solid fuel system (consisting of solidified methylated spirit). Schawbel further argues that unlike Schawbel's invention which uses liquid fuel, the '987 iron did not need a fuel delivery valve to control the flow of fuel. In this context, I am not persuaded that the language in the Second Preliminary Amendment was intended to differentiate the Schawbel device from the '987 device based on an internal versus an external fuel delivery valve means. Bear in mind that neither party submitted the '987 patent or any expert testimony comparing the devices. It would be helpful to know

---

6. Conair also argues that if the claim is read so broadly, then the net effect would be to capture virtually any standard historical regulator valve system on an aerosol can. It also claims that the fuel delivery valve and control system predates the claimed invention. It points to Patent No. 4,543,968 entitled "Hair styling appliance." To the extent Conair is asserting an obviousness defense, it has not done so directly and the record is inadequate on the point.

whether the '987 patent had an external fuel delivery valve or any valve at all, which Schawbel was seeking to distinguish. Therefore, at least at this early stage of litigation, there is insufficient evidence in the record to support Conair's claim that this amendment shows "the deliberate, unequivocal surrender" of all external fuel supply valve means. *Cybor Corp.*, 138 F.3d at 1460.

### b. *The Actuator Means*

■ Conair also disputes infringement on the basis of the limitations in Claim 7 relating to the actuator means. The actuator means of Claim 7 includes "means for moving [a] plunger to a first position into operative engagement with [the] fuel delivery valve means for opening [the] fuel delivery valve means . . . ." '123, col. 13, lines 44–47. Schawbel explains that the "plunger engages the fuel delivery valve to allow fuel to flow to the burner." (Berger Aff. ¶ 19.)

Ruggiero initially asserted, "The actuator of the Conair device does not have a plunger, let alone one that operatively engages the fuel delivery valve." (Ruggiero Aff. ¶ 23.) Again, Conair appears to be obfuscating the issue with a nomenclature dispute. For example, its own diagram shows a plunger which looks virtually identical to the plunger in the Schawbel diagram. Once faced with pictures of the parts of its device, Conair backtracked, arguing that the plunger does not "operatively engage" the fuel delivery valve means, as disclosed in the specification of the '123 patent. Conair points out that an element in the Conair device prevents the plunger from hitting the cap of the fuel delivery valve. This argument is not persuasive for two reasons. First, the pictures submitted by Schawbel (Aug. 10, 2000 Hr'g, Conair Device Boards A, B, C) do not plainly support this contention that there is an unnamed element preventing the plunger from hitting the cap. Second, Conair submits no evidence to refute Berger's affidavit stating that the plunger (as labeled in Conair Device Boards A, B, and C) hits the cap of the Conair fuel delivery valve to open it and allow fuel to flow to the burner. (Decl. of Peter L. Berger ¶¶ 17–18.) Indeed, at oral argument, I concluded that Conair's argument was predicated on labeling part of its dual valve system (i.e., the upper half of the fuel delivery valve) as an "actuator." (Aug. 10, 2000 Hr'g Tr. 20, 57–58.) I find a likelihood of success on the claim that Conair infringes this element.

### c. *Biasing Means*

Conair's final argument against infringement is that the accused device does not have a "biasing" means (i.e., a spring) that applies constant pressure to the plunger to push it into engagement with the fuel delivery valve means.

Claim 7 requires,

said means for moving said plunger to said first position includes biasing means for applying a force to said plunger, wherein said biasing means constantly applies said force to said plunger to bias the latter into engagement with said fuel delivery valve means to control the latter to permit the flow of fuel from said fuel supply means.

'123, col. 13, lines 52–58. Schawbel relies on Figure 2 of the '123 patent to demonstrate the structure of the biasing means. According to this figure, the biasing means is a spring 124 which constantly applies force to the plunger 106 to force the plunger into engagement with the valve cap 80 of the fuel delivery valve to permit the flow of fuel from the fuel supply. (Berger Aff. ¶¶ 20, 21.)

In response, Conair contends that "the force applied to open the plunger of the canister valve is not a biasing means. Instead, the canister mates with the first or actuator valve so that the plunger of the canister is depressed to open the canister valve." (Ruggiero Aff. ¶ 23.) Again, Conair appears to be playing a labeling game by referring to the plunger of the canister

valve. What is at issue is another plunger which engages the fuel delivery valve (which this Court earlier ruled met the structural limitations of the fuel delivery supply means). As Conair conceded at oral argument, the Conair device has a plunger which applies force to the fuel delivery valve means to control the flow of fuel. (Aug. 10, 2000 Hr'g Tr. at 66.) The pictures of the Conair device show a spring adjacent to a plunger. (Conair Device Board A.) Thus, Schawbel has demonstrated literal infringement on the biasing means structural limitation of Claim 7.

## 2. Invalidity

### a. Presumption of Validity

A patent, and each one of its individual claims, is statutorily presumed to be valid. 35 U.S.C. § 282. However, the "presumption [of validity] is weakened where the most pertinent prior art was not considered by the Patent Office." *Nossen v. United States,* 189 Ct.Cl. 1, 416 F.2d 1362, 1371 (1969). In addition to the statutory presumption, "a claim must be construed to uphold its validity if possible." *Lewmar Marine, Inc. v. Barient, Inc.,* 827 F.2d 744, 747 (Fed.Cir.1987) (holding that inclusion of the word "only" in the clause of a patent's claim limitation saved a later patent from invalidation by anticipation, as the word "only" could not be read out of the prior patent's claim).

While 35 U.S.C. § 282 assigns the burden of establishing a patent's invalidity to the challenger, the Federal Circuit has declared that "at the preliminary injunction stage, because of the extraordinary nature of the relief, the patentee carries the burden of showing likelihood of success on the merits with respect to the patent's validity...." *Nutrition 21 v. United States,* 930 F.2d 867, 869 (Fed.Cir.1991). In other words, the patentee "retain[s] the burden of showing a reasonable likelihood that the attack on its patent's validity would fail." *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed. Cir.1987). This burden requires the patentee to make a "clear showing" that the challenger would be undermined. *Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233 (Fed.Cir.1985). "While it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's defense lacks substantial merit." *Id.* Thus, the patentee's obligation is not independently to produce affirmative evidence bolstering its patent's validity; rather, the patentee must clearly show that it can disprove the challenger's bases for invalidity.

### b. Anticipation

Conair alleges that Schawbel's '123 patent is invalid because Patent No. 4,119,088 granted to Nigel L. Sim in 1978 for a soldering iron ("Sim patent") reads directly on Schawbel's '123 patent. Thus, Conair's theory of invalidity is that of anticipation under 35 U.S.C. § 102(e). ("A person shall be entitled to a patent unless ... the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent...." 35 U.S.C. § 102(e).) "Anticipation under 35 U.S.C. § 102 requires the presence in a single prior art disclosure of each and every element of a claimed invention." *Lewmar Marine,* 827 F.2d at 747.

The test for anticipation has been stated as "[t]hat which would literally infringe if later in time anticipates if earlier than the date of invention." *Id.* While "invalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention," this may be done "either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.,* 212 F.3d 1272, 1282 (Fed.Cir.2000).

#### c. *Sim Patent as a Proper Prior Art Reference*

The anticipation defense necessitates the identification of prior art that reads on the patent or claim at issue. Plaintiff Schawbel has questioned the appropriateness of comparing its patent for a curling iron, also deemed a "portable heating appliance" in the patent itself, to Sim's patent for a soldering iron. Because the '123 patent itself refers to the soldering iron as a possible application, '123 patent, col. 6, line 15, I conclude that comparison with the Sim patent is proper. *See In re Paulsen*, 30 F.3d 1475, 1478–79 (Fed.Cir.1994) (holding that a Japanese patent for a "desktop calculator contained within a housing having the form of a portable attache case" was a proper prior art reference for challenging a patent for a portable computer because "a calculator is a type of computer" and "would have suggested the claimed subject matter to a person of ordinary skill in the art.")

#### d. *The Distinctive Elements of Claim 7*

In defense of the '123 patent's validity, Schawbel argues that there are two elements in Claim 7 that are not taught by the Sim patent. First, and of less significance, Schawbel asserts that the burner means taught in the '123 patent includes burner nozzle 262 which "has a substantially cylindrical configuration, with a plurality of equally spaced gear-like teeth 266 extending in the lengthwise direction on the outer surface of burner tube 260." '123, col. 11, lines 64–67; *see also* '123, Figures 6–8. The Sim patent contains no such nozzle. With this modification, the burner tube produces an improved flame and reduces the "unpredictability and unevenness of the gas/air mixture as it enters burner tube 260." '123, col. 12, lines 4–6. Affiant James V. Bonnema, Schawbel's Vice President of Research, states, "Sim uses a straight open tube; even though he refers to it as a nozzle, there is no structure equivalent to nozzle 262." (Bonnema Second Aff. ¶ 16.)

Conair's rebuttal is weak. Without explaining how the Sim burner tube anticipates this burner nozzle, Conair's affiant Ruggiero asserts, "Again, Bonnema is guilty of reading limitations into [C]laim 7 of the specific structure of a nozzle in order to distinguish [C]laim 7 from the Sim Patent." (Ruggiero Second Aff. ¶ 19.) However, in construing the means-plus-function claim of the '123 patent, the Court is required to look at the corresponding structure described in the specification, the preferred embodiments, and the accompanying drawings. *See Kemco*, 208 F.3d at 1361–62. Conair does not explain why the nozzle described in the specification and illustrated in the diagrams is not the accompanying structure for the '123 burner means or how this nozzle was taught by the Sim patent.

Second, and more importantly, Schawbel submits that the actuator means referred to in Claim 7 is the key distinguishing feature. The claim refers to "means for moving a plunger to a *first position into operative engagement* with said fuel delivery valve means for *opening said fuel delivery valve means* and means for moving said plunger to a *second position out of operative engagement* with said fuel delivery valve means so that the latter *terminates the flow of fuel* to said burner means." '123, col. 13, lines 44–51 (emphasis added).

Again, under § 112, ¶ 6, the Court must consult the specification to learn what structure performs the function described by a claim's means-plus-function language. 35 U.S.C. § 112, ¶ 6. The specification refers to an "ON/OFF switch." This switch is also referred to as number 16 in Figure 2 of the patent. The specification states, "Switch button 16, ... functions as an ON/OFF switch, to start the flow of a gas fuel, such as butane, from a fuel cartridge 18." '123, col. 3, lines 23–26. The specification further describes how "the fuel is ignited by an electric spark when the ignition push button is pressed, and burns as

long as [the] ON/OFF switch button is ON." '123, col. 7, lines 3–5.

Schawbel argues that the Sim soldering iron does not have this on-off structure. The on-off means in the Sim patent involves the fuel flow/temperature adjustment means. Sim patent, col. 6, lines 46–49; lines 64–66; line 67 through col. 7, line 2. "On" status is reached only by rotating a heat shield, which then screws a stem into the end of a cap, which applies force to a spring to initiate the mechanism for releasing gas at the desired flow rate. Sim patent, col. 5, lines 65 – col. 6, line 17. When the user adjusts the position of stem 3 (by rotating heat shield 4), the user adjusts the gas pressure of the device: "[a]ny variation in pressure applied to the spring 11 by the adjustment of stem 3 will cause a corresponding change in pressure at the jet orifice 23." Sim patent, col. 6, lines 46–49. In the second embodiment, the gas container is inserted into a gripping member, "[t]o control the gasflow, container 94 together with member 92 are rotated...." Sim patent, col. 10, lines 40–44 and 56–59. In both embodiments, "[t]he output of the iron is readily adjustable by means of the differential valve." Sim patent, col. 11, lines 28–29. Although Conair fairly argues that Sim has an on-off mechanism which performs the function described in the claim, the structures seem different.

In addition, Claim 7 requires that when the plunger is in the first position, the "biasing means constantly applies [a] force to said plunger to bias the latter into engagement with said fuel delivery valve means ...." '123, col. 13, lines 52–57. Schawbel argues,

> In Sim's first embodiment, the biasing means is variable with the adjustment mechanism. In the second embodiment, the valve is moved out of engagement. By contrast, the Conair [sic] device has a biasing means constantly applying force to the plunger and a separate means for moving the plunger out of engagement with the valve.

(Bonnema Second Aff. ¶ 17.) Ruggiero responds by stating,

> However ... Plaintiff missed the fact that the Sim patent also teaches that for any one setting of the control stem 3, *the system settles down to a constant pressure. Id.,* col. 6, lines 44–46. Hence, in order for the Sim patent to settle down to a constant pressure, the biasing means *must* constantly apply a force on the plunger.

(Ruggiero Second Aff. ¶ 21.) However, the Sim patent acknowledges that there is a variation in pressure applied to the spring by adjustment of the stem, which causes "a corresponding change in pressure at the jet orifice." Sim patent, col. 6, lines 46–49. While Conair has submitted evidence that for any one setting the biasing means in the Sim device constantly applies force on the plunger, the '123 patent requires that the biasing means constantly apply force to the plunger when it is in the first position without variability in pressure.

### C. *Irreparable Harm*

██ Where the patentee makes a clear showing of likelihood of success on infringement and validity, it is entitled to the presumption of irreparable harm. *Roper Corp. v. Litton Sys., Inc.,* 757 F.2d 1266, 1271 (Fed.Cir.1985). The Federal Circuit has noted that "it must be not merely a reasonable but a strong showing indeed." *Id.* As discussed at length above, Schawbel has adequately met this burden. "Like most legal presumptions, it is rebuttable by clear evidence that it is overcome in the case at hand." *Id.* To overcome the presumption, the alleged infringer must "bring forward evidence that irreparable injury would not actually be suffered by the patentee if the motion for preliminary injunction were denied." *Id.*

Conair, however, has not disproved the irreparable harm Schawbel claims it will suffer. Even apart from the presumption of irreparable harm, the loss of market share and business relationships due to

infringement may independently constitute irreparable harm. *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed.Cir.1996) (finding that the absence of preliminary injunctive relief could threaten patentee's significant market position); *Hybritech*, 849 F.2d at 1456 (holding that the grant of a preliminary injunction was based on more than an unwarranted presumption of irreparable harm where the district court found the patentee would suffer lost market position and obstructed business relationships in the market).

Schawbel claims that it will likely be forced out of business unless Conair is enjoined from marketing its curling iron, as butane-powered curling irons and replacement cartridges comprise eighty to ninety percent of Schawbel's business. In particular, Schawbel points to its current licensee's inability to secure market share for Schawbel's product due to Conair's stronghold on retailer's SKUs, which Conair acquired when it held an exclusive licensing agreement with Schawbel. It points out that there is a limited market for these products and that Schawbel essentially developed that market with Conair as a distributor over a long period of time. As a result, Schawbel contends that it has been frozen out of the usually prime holiday season and has been unable to form relationships of its own with retailers. Schawbel agrees with Conair that the vast majority of orders for the holiday season were made during late spring and early summer, but insists that it will be able to preserve some Christmas business and has ordered product in the hope the preliminary injunction will issue. Schawbel recently submitted a fourth affidavit encouraging the Court to hurry its decision by expressing its concern about imminent bankruptcy.

Conair has submitted several affidavits explaining its troubled relationship with Schawbel and disputing Schawbel's claim that it can sell the six hundred thousand units that Schawbel claims are necessary to avoid bankruptcy. Conair also asserts that any possible loss could be adequately compensated with monetary damages. In support of this assertion, Conair argues that Schawbel's licensing agreement with Helen of Troy Ltd., and its former agreement with Conair, demonstrate that Schawbel could be made whole with a monetary award that is based on a reasonable royalty rate. This contention is insufficient to refute the presumption of irreparable harm.

 Previous licensing agreements can undermine an irreparable harm claim. *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed.Cir.1995) (stating that movant's offer to license indicates its willingness to "forgo its patent rights for compensation"); *T.J. Smith & Nephew Ltd. v. Consolidated Med. Equip., Inc.*, 821 F.2d 646, 648 (Fed. Cir.1987) (considering the fact that the movant had "long licensed its patent to two licensees"). However, the Federal Circuit has distinguished exclusive agreements from non-exclusive agreements. *Polymer Tech., Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed.Cir.1996). Exclusive agreements, like the one Schawbel had with Conair but now maintains with Helen of Troy Ltd., weigh in favor irreparable harm because they signal the patentee's intent to preserve the right to exclude others from the market. *Id.* Therefore, Schawbel's practice of exclusively licensing its technology to one licensee fails to rebut the presumption of irreparable harm.

### D. *Hardships*

Schawbel argues that the balance of hardships tips in its favor due to its likely success on the merits and the likelihood that it will be driven out of business if Conair is not enjoined. Conair asserts that the balance of hardships weighs down on its side, because it has invested nearly $1 million in developing, marketing, and promoting its products.

In considering the balance of hardships, "[t]he magnitude of the threatened injury to the patent owner is weighed, in the light

of the strength of the showing of likelihood of success on the merits, against the injury to the accused infringer if the preliminary decision is in error." *H.H. Robertson*, 820 F.2d at 390. If a plaintiff will ultimately prevail at trial, then any harm befalling the defendant is its own doing. *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed.Cir. 1997) (stating that harm to the defendant was not relevant because it had no right to infringe on the plaintiff's patent). "[O]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed.Cir.1986).

### E. *Public Interest*

"Typically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by grant of preliminary relief." *Hybritech*, 849 F.2d at 1458 (affirming a decision not to enjoin the production of infringing hepatitis and cancer test kits). It is safe to say that, no matter what is the fashion trend of the day, restricting the public's access to Conair's butane-powered curling iron does not tread on a "critical public interest."

### F. *On Balance*

On balance, Schawbel has shown a likelihood of success on infringement of Claim 7 of the '123 patent under Section 112, ¶ 6. I also conclude that Schawbel has demonstrated a likelihood of success on its assertion that the patent is not invalid based on the teachings of the Sim patent. While preliminary relief is a drastic remedy in the patent world, the plaintiff has demonstrated it is likely to go out of business unless it can sell this product which constitutes most of its revenue. Any harm to Conair, if it prevails, will be cured by a substantial bond. Given its market strength in personal care products, Conair is likely to recoup its market share if it prevails on its defenses (or if Schawbel goes bankrupt as it predicts). Also, I plan to hold a speedy trial before next year's Christmas season.

### G. *Security Bond*

Under Fed.R.Civ.P. 65(c), before this Court can enjoin Conair, Schawbel must post security to reimburse Conair for damages caused by the injunction in the event that Schawbel is not successful at trial. Conair estimates that at least $1 million is necessary to cover its anticipated losses. (Lindsey Aff. ¶ 15.) Conair seeks an amount in excess of $500,000 spent on product development; expenditures exceeding $300,000 for promoting and marketing Conair's new curling iron; and approximately $1.2 million for lost sales and damage to Conair's business and goodwill in the first year of the injunction. (Lindsey Aff. ¶¶ 10, 12, 14, & 15.) During oral argument when Schawbel was asked whether it could afford a $1 million bond, Schawbel simply responded that it would post the bond that was set by the Court. (Aug. 10, 2000 Hr'g Tr. at 75.) Because the money that went into product development will be recouped if Conair prevails, the bond will not include that amount. Also, as the holiday season approaches, Conair's lost sales diminish. I conclude that $1 million is a reasonable bond amount.

## IV. ORDER

For the reasons herein, the Court *ALLOWS* Schawbel's motion for a preliminary injunction. (Docket No. 3.) Accordingly, Conair is prohibited from further infringement of Claim 7 of the '123 patent. As required by Fed.R.Civ.P. 65(c), Schawbel is ordered to post a bond in the amount of $1 million to compensate Conair for losses caused by the preliminary injunction in the event that Schawbel ultimately loses

this case at trial. Trial is set for May. The heat is on.

All discovery shall be complete by March 31, 2001. The party with the burden of proof shall provide expert disclosures on February 1, 2001, and any expert response shall be by February 23, 2001. Any motion for summary judgment or for claim construction shall be filed on April 13, 2001; any response shall be filed on April 27, 2001. A hearing shall be held on May 3, 2001 at 2:00 p.m. Trial shall begin on May 14, 2001.